UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
: 
ROBIN KIRK, :
: CASE NO. 1:09-cv-1405
Plaintiff, :
:
vs. : OPINION & ORDER
: [Resolving Doc. Nos. 15, 93]
SHAW ENVIRONMENTAL, INC., *et al.,* :
:
Defendants. :
:
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Defendants Shaw Environmental, Inc. and The Shaw Group, Inc. (collectively, "Shaw") move this Court to dismiss this action. [Doc. 15.] The Plaintiff opposes the motion. [Doc. 111.] Shaw has replied. [Doc. 119.]

For the following reasons, the Court **GRANTS** in part and **DENIES** in part the Shaw Defendants' motion to dismiss.

**I. Background & Procedural History**

Plaintiff Robin Kirk brings this suit against, *inter alia*, his former employer, Shaw Environmental, Inc. and its parent company, The Shaw Group, Inc., both Louisiana Corporations headquartered in Baton Rouge. Kirk claims that Shaw wrongfully terminated him in violation of Ohio public policy. Kirk alleges that Shaw fired him after he reported potential violations of the Foreign Corrupt Practices Act ("FCPA") and took adverse employment actions against him based

-1-

Case No. 1:09-cv-1405
Gwin, J.

upon a perceived disability.[1] [Doc. 35 at 14-17.] Kirk further claims that Defendant the Shaw Group tortiously interfered with his employment relationship with Shaw Environmental.[2] [*Id.* at 16.]

Plaintiff Kirk worked for Defendant Shaw Environmental from 2001 until Shaw fired him in June 2008. [Doc. 35 at 1.] In March 2005, the Plaintiff began working on a project that ultimately resulted in the formation of Defendant Shaw Arabia Limited, a joint venture between three entities: Shaw Environmental, Inc. International ("SEI International"), a subsidiary of Defendant the Shaw Group; non-party Pan Environmental Services Co. Ltd. ("Pan ESC"), a Saudi Arabian company represented in the Shaw Arabia venture by dismissed Defendant F. Steven Medeiros; and dismissed Defendant Projects International, LLC. [*Id.* at 3-4.] Throughout Plaintiff Kirk's involvement in the Shaw Arabia venture, non-party General Mike DeLong, then a Shaw employee, supervised Kirk. [*Id.* at 6.]

On May 27, 2006, Plaintiff Kirk relocated to Riyadh, Saudi Arabia, and in September 2006, Kirk became the General Manager of Shaw Arabia. [Doc. 35 at 7.] In that position, Plaintiff Kirk prepared proposals on behalf of Shaw Arabia for the Saudi Arabian Presidency of Meteorology and Environment ("the PME"), a Saudi government agency headed by Prince Turki Bin Nasser Bin Abdulaziz ("Prince Turki"), a member of the Saudi Royal family. [Doc. 35 at 5.] Prince Turki decided to whom to award PME contracts. [*Id.*] Plaintiff Kirk alleges that in approximately June

---

[1] Kirk first raised his disability claim in his Amended Complaint, filed October 14, 2009. [Doc. 35.] Because Shaw filed its Motion to Dismiss before the Plaintiff amended his Complaint, it does not address the disability claim. However, because the remaining allegations and claims against the Shaw Defendants are not materially different in the Original and Amended Complaints, the Court will consider the present Motion as one to dismiss the claims against Shaw for wrongful termination and tortious interference with an employment relationship in the Amended Complaint.

[2] In his Amended Complaint, Kirk also alleged that Projects International Equities, LLC, Shaw Arabia Limited, and F. Steven Medeiros tortiously interfered with his employment relationship with Shaw Environmental. Projects International and Medeiros have been dismissed as Defendants to this suit. [*See* Docs. 88, 106.] Shaw Arabia has also filed a motion to dismiss, which is currently pending before the Court. [Doc. 94.]

Case No. 1:09-cv-1405
Gwin, J.

2007, Medeiros informed him that Prince Turki was an investor in Shaw Arabia. [*Id.* at 8.] Plaintiff Kirk alleges he informed his supervisor, Al Husak, that Prince Turki would decide who should receive the contract and could personally benefit from a contract to Shaw Arabia. [*Id.* at 8.] Kirk alleges that he also attempted to convey his concern regarding Prince Turki to DeLong. [*Id.* at 9-10.]

On December, 12, 2007 Plaintiff Kirk returned to the United States for vacation. [Doc. 35 at 11.] Kirk alleges that upon his arrival, DeLong informed him that Shaw was removing Plaintiff Kirk from the position as the General Manager of Shaw Arabia. [*Id.*] Kirk did not return to Saudi Arabia. Plaintiff Kirk alleges that on or about December 17, 2007, he spoke with DeLong, Ron Oakley, George Bevan, and Patrick Thompson, all members of Shaw Environmental and/or the Shaw Group's executive management, about his termination from Shaw Arabia. [Doc. 35 at 12.] The Plaintiff claims that during this call, DeLong indicated that the Saudi Arabian partner solicited Kirk's removal. [*Id.*] Kirk further alleges that following his return to the United States, he sent several emails to Shaw management in attempt to discuss his concerns about Prince Turki. [*Id.* at 11-13.]

Kirk alleges that in February 2008, Kerry David, in house counsel for Shaw, contacted him to discuss Prince Turki and Shaw Arabia. [*Id.* at 13.] Plaintiff Kirk alleges that he told David that he had knowledge about Prince Turki's potential conflicted financial interest and told David that he had conveyed this information to Delong, Husak, and Malcolm Jarrell, who had replaced Husak as Kirk's supervisor. [*Id.*]

Plaintiff Kirk alleges that in March 2008 he spoke with Harry Dravecky, District Manager for Shaw E&I's Mid-Atlantic division, regarding a potential job opportunity with Dravecky's team. [Doc. 35 at 13.] Kirk alleges that he attempted to accept the offered position, but that Jarrell subsequently informed him that The Shaw Group had no jobs available anywhere in the organization

-3-

Case No. 1:09-cv-1405
Gwin, J.

for Kirk, and that Shaw would terminate Kirk's employment. [*Id.* at 14.] Kirk requested a furlough due to his medical condition, and on March 18, 2008, Shaw placed Kirk on a ninety-day unpaid furlough. [*Id.*] On June 16, 2008, Shaw fired the plaintiff. [*Id.*]

In May 2009, Plaintiff Kirk sued the Shaw Defendants in the Cuyahoga County Court of Common Pleas. [Doc. 1-1.] The Defendants removed the case to this Court. [Doc. 1.] In his Complaint, Kirk alleges that Shaw wrongfully terminated him in violation of Ohio public policy due to his reporting potential violations of the Foreign Corrupt Practices Act ("FCPA") and that the Shaw Group tortiously interfered with his employment relationship with Shaw Environmental. [Doc. 1-1 at 14-17.] The Shaw Defendants moved to dismiss the original Complaint on July 27, 2009. [Doc. 15.]

On August 26, 2009, and again on September 25, 2009, the Plaintiff moved for extensions of time to respond to the Defendants' motion to dismiss. [Docs. 18, 28.] The Court ultimately ordered that the Plaintiff file his opposition to the motion to dismiss in compliance with the case management plan. [Doc. 31.]

On October 14, 2009, Plaintiff Kirk amended his Complaint, adding claims that Shaw discriminated against him based on a perceived disability, his chronic lymphocytic leukemia, and joining Defendants Medeiros, Shaw Arabia, and Projects International, who Kirk alleges tortiously interfered with his employment relationship with Shaw.[3/] [Doc. 35.]

---

[3/] As described above, the Court dismissed Projects International pursuant to a stipulated dismissal between Kirk and Projects International on February 5, 2010. [Doc. 88.]

Following the issuance of a Show Cause Order [Doc. 98], the Court dismissed Defendant Medeiros without prejudice for the Plaintiff's failure to execute service upon Medeiros [Doc. 106].

On February 8, 2010, Shaw Arabia filed a motion to dismiss Kirk's claims against it in the Second Amended Complaint. [Doc. 94.] Instead of filing an opposition to Shaw Arabia's Motion to dismiss, the Plaintiff moved for leave
(continued...)

-4-

Case No. 1:09-cv-1405
Gwin, J.

After the parties moved for additional extensions to the dispositive motion deadlines [*see* Docs. 38, 107, 110], the Plaintiff filed his opposition to the Shaw Defendants' motion to dismiss on March 1, 2010. The Defendants replied on March 8, 2010. [Doc. 119.] The motion is now ripe for ruling.

## II. Legal Standard

A court may grant a motion to dismiss only when "it appears beyond doubt" that the plaintiff fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6); *Conley v. Gibson*, 355 U.S. 41, 45 (1957). In deciding a motion to dismiss under Rule 12(b)(6), "a court should assume the[] veracity" of "well-pleaded factual allegations," but need not accept a plaintiff's legal conclusions as true. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)

Federal Rule of Civil Procedure 8 provides the general standard of pleading and only requires that a complaint "contain . . . a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S. Ct. at 1949 (citations removed).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic v. Twombly*,

---

[3]/(...continued)
to file a Second Amended Complaint on March 2, 2010 [Doc. 115.] The Court denied this motion on March 8, 2010. [Doc. 118.] Shaw Arabia's Motion to Dismiss is still pending before the Court.

On February 8, 2010, the Shaw Group and Shaw Environmental filed separate motions for summary judgment on all claims the Plaintiff alleges against them in his Amended Complaint. [Docs. 93, 96.] These motions are also still pending before the Court.

-5-

Case No. 1:09-cv-1405
Gwin, J.

550 U.S. 544, 570 (2007)).  The plausibility requirement is not a "probability requirement," but requires "more than a sheer possibility that the defendant has acted unlawfully."  *Id.*

### III. Analysis

In their motion to dismiss, the Defendants argue that the Court should dismiss Kirk's claim against Shaw Environmental for wrongful termination in violation of public policy because the Amended Complaint fails to adequately allege two elements of this claim, the clarity and jeopardy elements. [Doc. 15 at 1.] The Defendants also argue that the Court should dismiss Kirk's claim against the Shaw Group for tortious interference with an employment relationship because this claim fails as a matter of law. [Doc. 15 at 2.] The Court will consider each argument in turn.

*A. Wrongful Termination in Violation of Public Policy*

The Ohio Supreme Court has recognized a tort for wrongful discharge in violation of public policy as an exception to the employment at will doctrine. *Greeley v. Miami Valley Contrs., Inc.*, 551 N.E.2d 981 (1990). To maintain a *Greeley* claim of wrongful discharge in violation of public policy a plaintiff must allege:

> 1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element);
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element);
>
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element); and
>
> 4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Collins v. Rizkana*, 652 N.E.2d 653, 657-58 (Ohio 1995) (citations omitted).  "[T]he clarity and

Case No. 1:09-cv-1405
Gwin, J.

jeopardy elements . . . are questions of law to be determined by the court," while "'the jury decides factual issues relating to causation and overriding justification.'" *Id.* at 658 (citation omitted).

In their motion, the Shaw Defendants argue that the Plaintiff's claim should be dismissed because he cannot establish, as a matter of law, the clarity and jeopardy elements. [Doc. 15 at 1.] The Defendants argue (1) that the Plaintiff's claim is preempted by the Ohio Whistleblower statute, O.R.C. § 4113.52; (2) that the Foreign Corrupt Practices Act ("FCPA") does not establish the clear public policy of Ohio; and (3) that failure to allow a *Greeley* claim such as Kirk's would not jeopardize any Ohio public policy that opposes corruptly obtaining foreign contracts. Because the resolution of the Defendants' first argument relies somewhat on the resolution of their second argument, the Court will first consider whether the FCPA expresses a clear public policy for purposes of a *Greeley* claim under Ohio law.

The Ohio Supreme Court has made clear that federal law can serve as a source of public policy for a *Greeley* claim. *Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308, 322 (Ohio 1997). Ohio courts have seemingly not yet considered whether the FCPA is such a federal statute that expresses the public policy of Ohio. Courts in other states to have considered the issue are split. In *Adler v. American Standard Corp.*, the U.S. District Court for the District of Maryland concluded that the Foreign Corrupt Practices Act could serve as a basis for the public policy of Maryland. 538 F. Supp. 572, 578-79 (D. Md. 1982), *rev'd in part by Adler v. American Standard Corp.*, 830 F.2d 1303 (4th Cir. 1987). On appeal following a jury verdict for the Plaintiff, the Fourth Circuit reversed the judgment based upon the evidence presented at trial. 830 F.2d 1303. At the close of evidence, the district judge ruled that Adler had failed to prove any violation of the seventeen statutes cited in his pleadings, including the FCPA. *Id.* at 1305. The trial court nonetheless instructed the jury that, even

Case No. 1:09-cv-1405
Gwin, J.

without a statutory violation, it would be a violation of Maryland public policy if Adler's termination was motivated by a desire to prevent disclosure of certain illegal activities. *Id.* at 1306. The Fourth Circuit reversed, finding that the trial court erred in instructing the jury that, even without a statutory violation, it would be a violation of Maryland public policy if Adler's termination was motivated by a desire to prevent disclosure of certain illegal activities. *Id.* The Fourth Circuit held that, in the absence of a clear legislative or state court directive, the tort of wrongful termination in violation of Maryland public policy should be limited to "situations involving the actual refusal to engage in illegal activity, or the intention to fulfill a statutorily prescribed duty." *Id.* at 1307. Because the trial court had found that no such statutory violation occurred, the Fourth Circuit reversed the trial court judgment.

In *Thompson v. St. Regis Paper Company*, the Washington Supreme Court held that the Foreign Corrupt Practices Act provides a clear expression of public policy that bribery of foreign officials is contrary to the public interest. 685 P.2d 1081, 1090 (Wash. 1984). The court thus allowed a plaintiff to maintain a claim for wrongful termination in violation of public policy based on his allegation that he was terminated for, *inter alia*, instituting accounting practices in compliance with the FCPA. *Id.*

An Illinois appellate court came to the opposite conclusion in *Pratt v. Caterpillar Tractor Co.*, 500 N.E.2d 1001 (Ill. App. Ct. 1986). That court concluded that the FCPA did not express the clear policy of the state of Illinois sufficient to support an Illinois state law claim for retaliatory discharge. *Id.* at 1002-03. The court concluded that the "exclusively Federal concerns" embodied in the FCPA could not support an Illinois common law remedy. *Id.* at 1003. The Illinois Supreme Court denied leave to appeal, over a vigorous dissent by Justice Simon, in which he argued that the

-8-

Case No. 1:09-cv-1405
Gwin, J.

Supremacy Clause and the federal government's plenary power in foreign affairs direct that a national foreign policy directive such as the FCPA must be the policy of the fifty states. 506 N.E.2d 959 (Ill. 1987).

Most recently, the New Jersey Supreme Court has held that the FCPA expresses New Jersey public policy for purposes of a wrongful termination claim. *D'Agostino v. Johnson and Johnson, Inc.*, 628 A.2d 305 (N.J. 1993). In *D'Agostino*, the plaintiff, an employee of a Swiss subsidiary of Johnson & Johnson, alleged that the defendants directed his employer to terminate him for refusing to pay bribes to foreign government officials. The New Jersey Supreme Court held that "Congress, through the FCPA, has expressed a need to protect the public against the bribing of foreign officials by domestic companies. That federal policy represents a clear mandate of state policy, especially when a violation of the federal policy has an impact on the health and welfare of the forum state." 628 A.2d at 314.

This Court follows those courts that have held that the FCPA represents a mandate of state policy and finds that the FCPA manifests a public policy of Ohio sufficient to satisfy the clarity element of a wrongful termination *Greeley* claim. The Court finds the *D'Agostino* court's and Justice Simon's reasoning regarding why the Foreign Corrupt Practices Act is a national law that represents the public policy of the fifty states to be convincing. Further, Ohio's criminal statutes express a public policy against bribing public officials. *See* Ohio Rev. Code § 2921.02. Moreover, Ohio courts have consistently found that federal laws clearly establish public policy of Ohio. *See e.g.*, *Kulch*, 677 N.E. 2d at 322 (holding that Federal Occupational Safety and Health Act ("OSHA") may serve as a basis for recognition of a common-law cause of action for wrongful discharge in violation of public policy); *Wiles v. Medina Auto Parts*, 773 N.E.2d 526, 530-31 (Ohio

Case No. 1:09-cv-1405
Gwin, J.

2002)(Federal Family Medical Leave Act ("FMLA") manifests sufficiently clear public policy to satisfy clarity element). Accordingly, the Court finds that it is the public policy of Ohio to protect the public against American companies' bribing of foreign officials, and that the FCPA sufficiently clearly states this policy to satisfy the clarity element of an Ohio claim for wrongful termination in violation of public policy.

The Defendants also argue that the Plaintiff's claim is preempted by the Ohio Whistleblower statute, O.R.C. § 4113.52. The Defendants rely on *Contreras v. Ferro Corp.*, in which the Ohio Supreme Court held that an employee who fails to strictly comply with the procedural requirements of the whistleblower statute cannot maintain a *Greeley* claim based upon the public policy embodied in that statute. 652 N.E.2d 940, 944-46 (Ohio 1995).

In *Kulch v. Structural Fibers Inc.*, the Ohio Supreme Court clarified its holding in *Contreras*, and held that the plaintiff could maintain his common law wrongful-discharge claim on two bases. 677 N.E.2d 308 (Ohio 1997). First, the court allowed the Plaintiff's whistleblower statute *Greeley* claim to proceed because, though the plaintiff failed to comply with the procedural requirements of O.R.C. § 4113.52(A)(1)(a), he also alleged a claim under O.R.C. § 4413.52(A)(2). *Id.* at 323. Second, and more importantly for this case, the court held that, regardless of whether the plaintiff complied with the procedural requirements of the whistleblower statute, he could maintain his *Greeley* claim because it was "fully and independently supported" by another source of Ohio public policy–the workplace safety policies embodied in OSHA. *Id.*

Because, as explained above, the Court finds that Plaintiff Kirk's *Greeley* claim is based upon a clear manifest of public policy independent from the Ohio whistleblower statute–the FCPA, this claim is not foreclosed by the Ohio whistleblower statute.

-10-

Case No. 1:09-cv-1405
Gwin, J.

The Defendants further argue that the Plaintiff's wrongful termination claim should be dismissed because the Plaintiff fails to satisfy the jeopardy element. In analyzing whether the Plaintiff has satisfied the jeopardy element, the Court must decide "whether the absence of a cognizable *Greeley* claim based solely on a violation of the [FCPA] would seriously compromise the Act's statutory objectives. . . ." *Wiles*, 773 N.E.2d at 531. "An analysis of the jeopardy element necessarily involves inquiring into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful discharge claim. . . . If the statute that establishes the public policy contains its own remedies, it is less likely that tort liability is necessary to prevent dismissals from interfering with realizing the statutory policy." *Id.* Recognizing a common-law claim for wrongful discharge is more likely appropriate if the statute or policy does not itself provide a remedy or private cause of action. *Anders v. Specialty Chemical Resources, Inc.*, 700 N.E.2d 39, 46 (Ohio Ct. App. 1997).

In *Wiles*, the court held that the plaintiff could not maintain a *Greeley* claim based on the FMLA because "the FMLA's remedial scheme provides an employee with a meaningful opportunity to place himself or herself in the same position the employee would have been absent the employer's violation of the FMLA." 773 N.E.2d at 532. Thus, the court concluded, disallowing a common law wrongful termination claim based upon the FMLA would not jeopardize the public policy embodied in the Act. In contrast, the FCPA provides no private right of action for employees who are terminated in retaliation for reporting bribes or for refusing to participate in conduct that violates the FCPA..

The Defendants argue that the Plaintiff's claim does not satisfy the jeopardy element (1) because the FCPA provides significant statutory penalties sufficient to deter improper conduct, and

-11-

Case No. 1:09-cv-1405
Gwin, J.

(2) because the Plaintiff does not allege that he reported the alleged FCPA violations to the federal authorities, and thus his actions were not in furtherance of the public policy. Both of these arguments fail. Ohio courts have allowed *Greeley* claims based upon laws that provide significant civil or criminal penalties. *See, e.g., Anders*, 700 N.E.2d at 44-45 (allowing wrongful termination claim based upon public policy contained in two criminal statutes).

The Plaintiff's claim is also not foreclosed by his failure to report the suspected violation to federal authorities. The Plaintiff alleges that he reported suspected FCPA violations to his superiors, and that his employer then terminated him as a result of his bringing up the issue. If these allegations are true, which the Court must assume they are at this stage in the proceedings, the Plaintiff's termination jeopardizes the public policy embodied in the Foreign Corrupt Practices Act, because it would discourage employees from reporting suspicions of bribes of foreign officials. *Compare Kulch*, 677 N.E.2d at 323-24 (Ohio's policy favoring workplace safety would be jeopardized if employers were allowed to fire employees for reporting OSHA violations); *see also D'Agostino*, 638 A.2d at 319 ("a plaintiff attempting to state a cause of action for retaliatory discharge after being fired for reporting possible illegal activity need not allege or prove conclusively the law has been violated in order to state a cause of action"). Accordingly, the Court finds that the Plaintiff's claim sufficiently satisfies the jeopardy element to survive the Defendants' motion to dismiss.

For the foregoing reasons, the Court **DENIES** the Defendant's motion to dismiss the Plaintiff's claim for wrongful termination in violation of public policy against Shaw Environmental.

*B. Tortious Interference Claim*

The elements of a claim for tortious interference with a business relationship under Ohio law are: "(1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional

Case No. 1:09-cv-1405
Gwin, J.

interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Fitzgerald v. Roadway Express, Inc.*, 262 F. Supp. 2d 849, 859-60 (N.D. Ohio 2003) (quoting *Chandler & Assocs., Inc. v. America's Healthcare Alliance, Inc.*, 709 N.E.2d 190, 197 (Ohio 1997)). "The basic principle of a 'tortious interference' action is that one, who without privilege, induces or purposely causes a *third party* to discontinue a business relationship with *another* is liable to the other for the harm caused thereby." *Id.* Ohio recognizes the cause of action of tortious interference with a business relationship when the relationship at issue is an employment relationship. *Fitzgerald*, 262 F. Supp. 2d at 860.

The Shaw Defendants argue that the Shaw Group cannot be considered a third-party to the Plaintiff's employment relationship with Shaw Environmental because the Shaw Group is the parent company of Shaw Environmental. [Doc. 15-1 at 14-15.] The Ohio Supreme Court has apparently not considered this issue directly. Accordingly, this Court may look to Ohio Supreme Court dicta, state intermediate appellate court decisions, and judicial decisions from other districts to ascertain whether Ohio law recognizes a claim for tortious interference by a parent company with its subsidiary's employment relationships. *See Speroni S.P.A. v. Perceptron, Inc.*, 12 Fed. App'x 355, 359-60 (6th Cir. 2001).

Under Ohio law, a plaintiff-employee cannot state a claim for tortious interference with an employment relationship against fellow employees or supervisors for actions taken within the scope of their employment duties. *Fitzgerald*, 262 F. Supp. 2d at 860. Further, employees' claims for tortious interference against officers or other supervisory agents of employers must fail because "there is no third party who induced the breach. The agents are considered the same as the actual employer." *Id.* (quoting *Erebia v. Chrysler Plastic Prods. Corp.*, 891 F.2d 1212, 1216 (6th Cir.

Case No. 1:09-cv-1405
Gwin, J.

1989). At its core, a claim of tortious interference requires that an "outsider" to the employment relationship interfere with the relationship for the claim to be cognizable. *Courie v. Alcoa*, 382 N.E.2d 1230, 1237-38 (Ohio. Ct. App. 2005).

The Sixth Circuit has held that a plaintiff cannot maintain a claim for tortious interference with contractual relations against a parent company who allegedly interfered with its subsidiary's business relations. *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 801-02 (6th Cir. 2007)(finding that as a matter of law, parent and subsidiary are the same party for tortious interference claim under Michigan law); *see also Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988)(under Ohio law, plaintiff cannot sue defendant parent company for tortious interference with subsidiary's contractual relations because, as the parent company, defendant corporation was "standing in [subsidiary's] shoes," and was not third party). While under Ohio law, claims for tortious interference with contract and tortious interference with employment relations are not identical, this Court believes that the Sixth Circuit's analysis in *Canderm* and *Servo Kinetics* applies to this case.

In *Servo Kinetics*, the Sixth Circuit emphasized that because the economic interests of the parent company and the subsidiary so closely aligned, the parent company cannot be an "outsider" to the business relationship. *Servo Kinetics*, 475 F.3d at 801. Thus, the court concluded, a parent company acting for its own benefit, unlike a corporate agent acting for his or her own benefit, can never be considered a third party for the purposes of a tortious interference claim. *Id.* (citing *Canderm*, 862 F.2d at 601 (under Ohio law, corporate parent cannot legally interfere with subsidiary because it "was, in effect, the same entity" as subsidiary)).

Considering the relevant case law, the Court concludes that, under Ohio law, a plaintiff

-14-

Case No. 1:09-cv-1405
Gwin, J.

cannot state a claim for tortious interference against a parent company for interfering with the business relationships, including employment relationships, of its subsidiary, because the parent company is not a third-party to its subsidiary's business relationships.

In his Amended Complaint, the Plaintiff alleges that Shaw Environmental is a subsidiary of the Shaw Group. [Doc. 35 at 2.] The Court therefore finds that under Ohio law "there is no third party who induced the breach" because the Shaw Group, the parent company, should be "considered the same as the actual employer," Shaw Environmental. *Cf. Fitzgerald*, 262 F. Supp. 2d at 860. Accordingly, the Court finds that the Plaintiff cannot state a claim for tortious interference against the Shaw Group as a matter of law and **GRANTS** the Defendants' motion to dismiss the Plaintiff's tortious interference claim against the Shaw Group.

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part the Defendants' motion to dismiss. [Doc. 15.] The Court dismisses the Plaintiff's claim for tortious interference against the Shaw Group. Because this is the Plaintiff's only claim against it, the Shaw Group is dismissed as a party to this case.

Accordingly, the Court **DENIES AS MOOT** the Shaw Group's motion for summary judgment. [Doc. 93.] To the extent that Shaw Environmental incorporates certain arguments from the Shaw Group's motion into its own motion for summary judgment, the Court will consider these arguments. The Court will also consider the portions of the Plaintiff's opposition to the Shaw

Case No. 1:09-cv-1405
Gwin, J.

Group's motion for summary judgment and of the Shaw Group's reply in support of its motion that address these arguments.

    IT IS SO ORDERED.


Dated: March 31, 2010              s/     *James S. Gwin*
                                                                  JAMES S. GWIN
                                                                  UNITED STATES DISTRICT JUDGE